**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          dguerra@bursor.com

Reuben D. Nathan, Esq. (State Bar No. 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (State Bar No. 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: PETER DAWIDZIK

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER DAWIDZIK, on behalf of himself and all similarly situated persons,<br><br>                    Plaintiff,<br>v.<br><br>TESLA, INC., a Texas corporation,<br><br>                    Defendants. | Case No: 5:25-cv-01982-KK-SP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>   **1)  CAL. PENAL CODE § 638.51** |

Plaintiff PETER DAWIDZIK ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendants TESLA, INC., a Texas corporation ("Defendant" or "Tesla"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.tesla.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, which function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol ("IP") addresses, session data, and clickstream activity in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

/ / /

5.      When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.      When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics/Tag Manager/DoubleClick)
- Twitter Tracker
- StackAdapt Tracker

7.      The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.      The Trackers are operated by distinct third parties, including Google LLC ("Google") (as to the Google Trackers), X Corp. ("Twitter") (as to the Twitter Tracker), and StackAdapt Inc. ("StackAdapt") (as to the StackAdapt Tracker) (collectively, the "Third Parties"). Defendant aids, employs, agrees, and conspires with these third parties by enabling the Trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, behavioral analytics, and data monetization activities.

9.      Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, installed fonts, color depth, time zone, operating system, pages visited, session duration, scroll depth and/or mouse movement, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP (collectively, "User Information"). This information is used for behavioral profiling, geolocation tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted

marketing and advertising that enable Defendant to monetize its Website. That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

10.     Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc*., 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

11.     The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiff's and Class Members' IP addresses and User Information. Google Trackers (Analytics/Tag Manager/DoubleClick), Twitter Tracker, and StackAdapt Tracker combine the information they collect about Website users with information from other websites and add the IP addresses and User Information of Website users to comprehensive user profiles. These entities then use that information to track Plaintiff and Class Members across the Internet. Those aggregated data profiles are subsequently used and shared within the advertising ecosystem to enable targeted and tailored marketing campaigns based on extensive cross-site behavioral data.

12.     Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.

13.     By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated CIPA § 638.51, which prohibits the use of pen registers and trap and trace devices under these circumstances.

14.     Generalized references herein to users, visitors, and consumers expressly include Plaintiff and the Class Members.

## II.    **PARTIES**

15.    Plaintiff PETER DAWIDZIK is a California citizen residing in San Bernardino County and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period prior to the filing of the complaint in this matter.

16.    Plaintiff visited the Website for personal purposes on multiple occasions during the class period including but not limited to on July 1, 2025. Plaintiff is a California resident who accessed Tesla's website (www.tesla.com) from within the State of California using a device connected to a California-based network. The electronic communications intercepted and transmitted during Plaintiff's visit originated in California and were received by Plaintiff's browser in California.

17.    The interception of those communications occurred at the moment Tesla's tracking code executed on Plaintiff's device within California, before the data left the state's borders. On such occasion(s), Plaintiff interacted with the Website's homepage (among others) which is where Defendant intentionally embedded the Trackers on Plaintiff's device for the purpose of sharing Plaintiff's personal signaling, routing and addressing information as described herein. Furthermore, Tesla's inclusion of a detailed California privacy disclosure on its website supports the allegation that the company is knowingly directing its online activities toward California residents.

18.    By specifically referencing the rights afforded under the California Consumer Privacy Act and outlining tailored instructions for California consumers to exercise those rights, Tesla demonstrates an awareness of California's legal and regulatory environment. Such a disclosure is unnecessary for residents of other states or countries that do not have equivalent legal requirements; therefore, the presence of this policy indicates that Tesla anticipates, expects, and actively solicits engagement from California users on its website, further evidencing that Tesla has expressly aimed its website towards California consumers.

19.     The allegations set forth herein are based on the Website as configured when Plaintiff visited it, and on such occasion(s), Plaintiff interacted with the Website's homepage (among others), which is where Defendant intentionally embedded the Trackers on Plaintiff's device for the purpose of sharing Plaintiff's personal signaling, routing, and addressing information as described herein.

20.     Defendant TESLA, INC. is a Texas corporation that owns, operates, and/or controls the Website, which is an online platform that offers goods and services to consumers.

21.     Tesla is a leading U.S. technology and automotive company, recognized for its electric vehicles, energy storage solutions, and clean energy products. Headquartered in Austin, Texas, Tesla maintains a broad national and international presence. The company enables individuals and businesses to explore, customize, and order vehicles, manage accounts, schedule service appointments, and access support services through its primary consumer platform at www.tesla.com.

22.     Tesla operates as the flagship brand within its broader ecosystem of automotive, energy, and technology offerings. While the company provides a diverse range of products and services, the Tesla platform is directly responsible for facilitating vehicle configuration, order processing, payment management, and communications with customers. In managing its digital operations, Tesla collects and processes substantial amounts of user data for functions such as order fulfillment, user support, behavioral profiling, and targeted marketing.

23.     The Website serves as Tesla's primary digital touchpoint for customers. It allows users to research vehicles and energy products, reserve orders, schedule services, and access account management. In addition to these core features, the Website also functions as a data collection and advertising platform. Through the deployment of third-party tracking mechanisms including but not limited to the Trackers, Tesla gathers detailed information about user interactions with the Website. These practices are integral to Tesla's user engagement, marketing optimization, and audience analytics

strategies, and raise important considerations under CIPA and other relevant consumer privacy statutes.

### III.    JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

25.    This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

26.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff resides in this District; and (4) the injury to Plaintiff occurred within this District.

### IV.    GENERAL ALLEGATIONS

**1.    *The California Invasion of Privacy Act (CIPA)***

27.    Enacted in 1967, the California Invasion of Privacy Act is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat

to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

28.    CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. Cal. Penal Code § 638.51(a).

29.    A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication. Cal. Penal Code § 638.50(b).

30.    Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents. Cal. Penal Code § 638.50(b).

31.    In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

32.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

33.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

34.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line, capturing the incoming information.

35.     Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

36.     The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).

37.     Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. *See Campbell v. Facebook, Inc.*, 2020 WL 1023350; *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).

38.     Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.     *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

39.     When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

40.     The server's instructions cause the Trackers to be installed on users' browsers, including Plaintiff's browser. The Trackers then cause the browsers to send identifying information—including the users' IP addresses and User Information to the Third Parties. These Third Parties, through their Trackers, also set cookies on Website users' browsers, which send a unique identifier to these Third Parties that allows them to track users both over multiple visits to the Website and across the Internet.

41.     A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

1
2
3
4
5
6
7
8

**Figure 1:**



9    42.    The server's response included third-party tracking scripts that were

10   executed by the Plaintiff's and Class Members' web browsers. These scripts, once

11   executed, initiate client-side functions that capture routing and behavioral metadata and

12   transmit this data, typically via HTTPS requests, to the servers of third-party tracking

13   vendors. These actions occur without visible indicators or user awareness. The

14   transmitted data, the User Information, is used to profile users and facilitate targeted

15   advertising.

16   43.    The Trackers operate by initiating HTTP or HTTPS requests using either

17   the GET or POST method from the user's browser to external servers controlled by the

18   Third Parties. These requests are triggered by user interactions with the Website and are

19   used to transmit behavioral data and Device Metadata, including information such as

20   page views, click events, session duration, and identifying browser characteristics.

21   44.    Plaintiff and Class Members did not provide their prior consent to

22   Defendant to install the Trackers on their browsers or use the Trackers. Nor did

23   Defendant obtain a court order before installing or using the Trackers.

24   45.    An IP address is a numerical identifier assigned to each device or network

25   connected to the Internet, used to facilitate communication between systems. *See hiQ*

26   *Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common

27   format, known as IPv4, consists of four numbers separated by periods (*e.g.*,

28   191.145.132.123). IPv4 is the traditional format of IP addresses and, because it has a

finite amount of combinations, it is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

46.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

47.     Public IP addresses are globally unique identifiers assigned by Internet Service Providers ("ISPs") that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

48.     Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

49.     In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can

---

[1] *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com /learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

1  be reused across different networks without conflict. For example, a home network in

2  New York and an office network in Tokyo can both use the same private IP address (*e.g.*,

3  192.168.1.1) for their routers without conflict.

4      50.     The distinction between a public and private IP address is fundamental to

5  the architecture of modern networks. Public IP addresses facilitate global

6  communication, while private IP addresses conserve the finite amount of combinations

7  by making those IP addresses useable for local network communications on multiple

8  networks. And crucially, a private IP address does not divulge a user's geolocation,

9  whereas a public IP address does and is thus extensively used in advertising.

10      51.     An analogy is useful. A public IP address is like the number for a landline

11  telephone for a household. A private IP address is like each handset that is connected to

12  that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from

13  knowing the phone number that is making the call, while knowing whether Handset #1

14  versus Handset #2 is making a call provides additional information.

15      52.     The same is true of IP addresses. The public IP address divulges the

16  approximate location of the user that is connecting to the Internet and the router directing

17  those communications (presumably the user's house or workplace), and it is the means

18  through which the user actually communicates with the website and the Internet at large.

19  The private IP address then distinguishes between the devices accessing the same public

20  IP address.[2]

21

22

23

24

_____

25  [2] While the Trackers do not collect private IP addresses, as discussed below, the

26  Trackers also collect Device Metadata, which distinguishes between devices
   accessing the same public IP address.  So, by installing the Trackers on Website users'

27  browsers, Defendant allows third parties to collect information that is analogous to a
   telephone number (the public IP address) and the specific handset that is making the

28  call (the "Device Metadata").

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to
communicate with the rest of the internet.*

53.    Thus, the differences between public and private IP addresses are as
follows:[3]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

---

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA
(Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

54.    A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

55.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

56.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

57.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

58.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

59.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

households, businesses[,] and even individuals with ads that are relevant to their interests."[7] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

60.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

61.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

62.    "IP targeting capabilities are highly precise, with an accuracy rate of over

---

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

1   95%. This means that advertisers can deliver highly targeted ads to specific households

2   or businesses, rather than relying on more general demographics or behavioral data."[13]

3       63.    In addition to "reach[ing] their target audience with greater precision,"

4   businesses are incentivized to use a customer's public IP address because it "can be more

5   cost-effective than other forms of advertising."[14] "By targeting specific households or

6   businesses, businesses can avoid wasting money on ads that are unlikely to be seen by

7   their target audience."[15]

8       64.    In addition, "IP address targeting can help businesses to improve their

9   overall marketing strategy."[16] "By analyzing data on which households or businesses are

10  responding to their ads, businesses can refine their targeting strategy and improve their

11  overall marketing efforts."[17]

12      65.    The collection of IP addresses is particularly invasive here: As a report from

13  NATO found:

14              [a] data broker may receive information about a[]
15              [website] user, including his … IP address. The user then
                opens the [website] while his phone is connected to his
16              home Wi-Fi network. When this happens, the data broker
                can use the IP address of the home network to identify the
17              user's home, and append this to the unique profile it is
                compiling about the user. If the user has a computer
18              connected to the same network, this computer will have
                the same IP address. The data broker can then use the IP
19              address to connect the computer to the same user, and
                identify that user when their IP address makes requests on
20              other publisher pages within their ad network. Now the
                data broker knows that the same individual is using both
21
                the phone and the computer, which allows it to track
22

23

24  _____

    [13] *Id.*

25  [14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es,

26  LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-
    targeting-local-businesses-herbert-williams-z7bhf.

27  [15] *Id.*

    [16] *Id.*
28
    [17] *Id.*

behaviour across devices and target the user and their devices with ads on different networks.[18]

66.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

67.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

68.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

69.    Often times, third-party scripts are installed on websites "for advertising purposes."[21]

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledge base/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protectio n/reform/what-personal-data_en.

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[21] *Id.*

70.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

71.     Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

72.     As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

73.     Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

74.     Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

---

[22] *Id.*

75.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**3.      *The Use of Trackers or Beacons and Digital Fingerprinting***

76.     Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

77.     The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

78.     This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

79.     When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

80.     The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

81.     In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

82.     The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

83.     When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the

Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.    *Plaintiff And Class Members' Data Has Financial Value***

84.    Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

85.    Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

86.    There is "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

87.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

88.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data,

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444.

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/ businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data.

including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

89.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

90.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

91.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

---

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring  Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.
[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

**5.**    *Defendant Is Motivated To Monetize Consumer Information Regardless of*
*Consent*

92.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

93.    Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

94.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad

targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

95.    When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

## 6.    *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy*

96.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

97.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

98.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

99.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that

information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### a. Data Brokers And Real-Time Bidding: The Information Economy

#### *Data Brokers*

100.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

101.    Any entity that qualifies as a "data broker" under California law must specifically register as such. Cal. Civ. Code § 1798.99.82(a). Here, the StackAdapt tracker is operated by registered California data broker StackAdapt, Inc.

102.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

---

[29] Justin Sherman, Duke Sanford Cyber Policy Program, Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy, at 2 (Duke Sanford Cyber Policy Program, 2021), https://tinyurl.com/hy9fewhs.
[30] Sherman, *supra*, at 2.
[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15:

103.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited. Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

104.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

105.    This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

106.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used

PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[33] SHERMAN, *supra*, at 1.

[34] *Id*.

[35] *Id.* at 9.

to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

107.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

---

[36] *Id.*

[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

**Figure 4:**



108.    As noted above, data brokers, such as StackAdapt here, are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

---

[38] *Id.* at 11.

109.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

110.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

111.    In short, by collecting IP addresses, Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

112.    As a result of Defendant's installation of trackers operated by data brokers, including StackAdapt, together with numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is appended to existing profiles maintained by those brokers or used to generate new ones. This linkage is accomplished through the collection of IP addresses, device metadata, and other user information transmitted by the browsers of Defendant's Website visitors.

113.    These profiles are then served up to any companies that want to advertise to Defendant's users, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker

---

[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, McAfee (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.
[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, Fathom Analytics (May 10, 2022), https://usefathom.com/blog/data-brokers.

profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

114.    Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

115.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

116.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." "An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact."[42] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

117.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like StackAdapt and DoubleClick help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.
[42] *Id.*
[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

118.   The RTB process works as follows:

> After a user loads a website or app, an SSP will send user
> data to Advertising Exchanges … The user data, often
> referred to as "bidstream data," contains information like
> device identifiers, IP address, zip/postal code, GPS
> location, browsing history, location data, and more. After
> receiving the bidstream data, an Advertising Exchange
> will broadcast the data to several DSPs [here, *e.g.*,
> DoubleClick and StackAdapt]. The DSPs will then
> examine the broadcasted data to determine whether to
> make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's
> advertisement will appear to the user. Since most RTB
> auctions are held on the server/exchange side, instead of
> the client/browser side, the user only actually sees the
> winner of the auction and would not be aware of the DSPs
> who bid and lost. But even the losing DSPs still benefit
> because they also receive and collect the user data
> broadcasted during the RTB auction process. This
> information can be added to existing dossiers DSPs have
> on a user.[44]

**Figure 5:**



119.   Facilitating this real-time bidding process means SSPs and DSPs must have

as much information as possible about Defendant's users to procure the greatest interest

from advertisers and the highest bids. These entities receive assistance because

Defendant also installs the trackers of data brokers on its users' browsers:

---

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER,
https://www.appsflyer.com/glossary/real-time-bidding/.

the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

**Figure 6:**



120.    In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

---

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

121.   Likewise, DSP's like DoubleClick and StackAdapt generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

122.   All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

123.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

a.   "incentiviz[ing] invasive data-sharing" by "push[ing] publishers to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

b.   "send[ing] sensitive data across geographic borders."

c.   sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[46]

124.   Given DoubleClick and StackAdapt operate as DSPs here, the last point is particularly relevant, as it means Google and StackAdapt collect and disclose Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

---

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

125.  Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[47]

126.  For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[48]:

**Figure 7:**



127.  All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-

---

[47] Geoghegan, *supra*.

[48] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

128.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers like StackAdapt who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website. The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

129.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[49] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

130.    Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the*

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

*browser to tracker.com (step 1), and it responds back with
a REDIRECT request (step 2), instructing the user's
browser to issue another GET request to its collaborator
advertiser.com this time, using a specifically crafted URL
(step 3).*

…

When advertiser.com receives the above request along
with the cookie ID userABC, it finds out that userABC
visited website3.com. *To make matters worse,
advertiser.com also learns that the user whom
tracker.com knows as user123, and the user userABC is
basically one and the same user.* Effectively, CSync
enabled advertiser.com to collaborate with tracker.com, in
order to: (i) find out which users visit website3.com, and
(ii) *synchronize (i.e., join) two different identities
(cookies) of the same user on the web.*[51]

**Figure 8:**



131.   Through this process, third party trackers are not only able to resolve user

identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2

---

[51] Papadopoulos, *supra*, at 1433.

knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[52]

132.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[53] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[54] But if a tracker can "respawn" its cookie or link to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[55]

133.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[56]

134.    Cookie syncing is precisely what is happening here. When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit the Website.

135.    To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same. The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the

---

[52] Papadopoulos, *supra*, at 1434.
[53] *Id.*
[54] *See id.*
[55] *Id.*
[56] *Id.* at 1441.

Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

136.   Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

137.   Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

138.   Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number of advertisers themselves without knowledge or consent.

139.   When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

140.    On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

141.    Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

142.    The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

143.    StackAdapt and Google's DoubleClick both perform real-time behavioral advertising and cross-domain identity functions that expand the scope of user data captured through the Tesla Website. Each links a user's browsing activity on the Website to pseudonymous identifiers stored in cookies and transmitted through programmatic ad exchanges. DoubleClick and StackAdapt participate in synchronized identifier frameworks and bidstream exchanges, enabling third parties to match Tesla Website visitors to broader advertising profiles maintained across unrelated websites and devices.

These synchronized identifiers create persistent user profiles that extend beyond a single browsing session or platform. The data transmitted from the Tesla Website—including user IP address, page location, referrer URL, and browser identifiers—is combined with off-site behavioral information to generate monetizable audience segments. Those audience segments are then auctioned and retargeted within the programmatic advertising ecosystem to deliver personalized or interest-based ads to the same user across other websites and devices.

## V.    **SPECIFIC ALLEGATIONS**

### *1.    The Google Trackers*

144.    The Google Trackers are digital analytics and advertising technologies operated by Google LLC, consisting of Google Analytics 4 ("GA4"), Google Tag Manager ("GTM"), and DoubleClick ("Google Ads"). Together, these tools enable Google and its advertising and analytics clients to collect detailed interaction data, monitor engagement, and deploy additional tracking and advertising scripts through automated tag injection. Google Tag Manager functions as a container that dynamically loads other Google services, including GA4 and DoubleClick, upon page load. Google Analytics 4 measures and reports user behavior in granular detail for profiling, audience segmentation, marketing optimization, and targeted advertising.

145.    When implemented on the Website, the Google Trackers collect a broad range of metadata including page URLs, timestamps, referrer headers, and behavioral interaction data such as page views and click events. GA4 further records technical device identifiers such as IP address, screen resolution, browser type, operating system, and language settings. These data points are tied to persistent browser identifiers (_ga, *ga*<propertyID>, _gcl_au) placed in the user's storage by Google scripts. This persistence allows Google to link user sessions across multiple websites and devices, constructing longitudinal behavioral profiles. Audit findings confirm these identifiers were set automatically on initial visit without user interaction.

146.    The Google Trackers monitor user engagement signals on Tesla.com and transmit them to Google's ad and analytics infrastructure through requests to domains including       www.googletagmanager.com       analytics.google.com,       www.google-analytics.com, adservice.google.com, and googleads.g.doubleclick.net. Figure 9 below is a screenshot from the Website confirming that a Google Analytics tracking script was triggered automatically upon visiting the homepage. The browser's developer tools show a GET request to www.googletagmanager.com/gtag/js with the parameter id=G-50BXJLS04M and a gtm parameter, confirming that Google Analytics was injected by Google Tag Manager. Google Tag Manager is embedded within the Website and functions as a container for additional Google tracking infrastructure, including Google Analytics. The presence of the gtag/js request and its activation at the outset of the session confirms that Google's tracking technologies were loaded immediately upon page load, prior to any user interaction. GTM initiates the loading of gtag/js scripts as part of the initial page render and thereafter injects GA4 and DoubleClick functions to collect behavioral and addressing metadata before any user action occurs.

147.    Figure 9 below shows a Network panel display containing two visible HTTP GET requests to external JavaScript resources. The first entry lists the file name gtm.js?id=GTM-KMG5DM       with       the       full       request       URL       shown       as https://www.googletagmanager.com/gtm.js/…[full URL omitted], associated with the domain www.googletagmanager.com and recorded with a time value of 0 ms. The second entry lists gtm.js?id=GTM-PHWTRTJ with the full request URL shown as https://www.googletagmanager.com/gtm.js/…[full URL omitted], also linked to the domain www.googletagmanager.com and recorded at 0 ms. The displayed data constitutes direct evidence of network metadata including addressing and routing identifiers, request methods, and endpoint domains documenting the browser's communication sequence with the remote host.

**Figure 9:**



148.    Figure 10 below shows a network log display documenting four sequential requests recorded under the columns labeled Result, Protocol, Host, and URL. The first entry, JS 115, indicates a 200 status code using HTTPS protocol directed to the host www.googletagmanager.com with the URL path /gtm.js/…[full URL omitted]. The subsequent entries numbered 116, 117, and 118 each also display a 200 status code, listing hosts maps.googleapis.com and Tunnel to maps.googleapis.com:443 with URL paths /maps-api-v3/api/js/61/14/common.js and /maps-api-v3/api/js/61/14/util.js/…[full URL omitted]. Beneath the table, the raw header section shows the request method as GET with the request line /gtm.js?id=GTM-KMG5DM under HTTP/1.1, along with a series of visible parameter–value pairs: Accept: /, Accept-Encoding: gzip, deflate, br, zstd, Accept-Language: en-US,en;q=0.9, User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/141.0.0.0 Safari/537.36, Referer: https://www.tesla.com/…[full URL omitted], sec-ch-ua: "Google Chrome";v="141", "Not?A_Brand";v="8", "Chromium";v="141", sec-ch-ua-platform: "Windows", and Connection: keep-alive. These headers are visibly organized

as structured metadata showing the parameters transmitted in the client's HTTP request to the specified host. The displayed data provides verifiable network records evidencing the transmission path, header configuration, and endpoint identification of the observed exchange.

**Figure 10:**



149.   Figure 11 below shows a Network panel view containing several POST requests identified as "collect?v=2&tid=G-KFP…" directed to the external host analytics.google.com, with the visible Request URL shown as https://analytics.google.com/g/…[full URL omitted]. The display includes parameter fields such as en=page_view, cid=537895336.1745011268, ul=en-us, uap=macOS, uapy=14.6.1, and dl=https://www.tesla.com/…[full URL omitted]. The request section lists Request Method: POST, Status Code: 204 No Content, and Remote Address: 216.239.36.181:443. The visible response headers include Access-Control-Allow-Credentials: TRUE, Access-Control-Allow-Origin: https://www.tesla.com, Alt-Svc: h3=":443"; ma=2592000,h3-29=":443"; ma=2592000, Cache-Control: no-cache, no-store, must-revalidate, Content-Length: 0, Content-Security-Policy-Report-Only: script-

src 'none'; form-action 'none'; frame-src 'none'; report-uri https://csp.withgoogle.com/csp/scaffolding/…[full URL omitted], Content-Type: text/plain, Cross-Origin-Opener-Policy-Report-Only: same-origin; report-to=ascnsrsggc:158:0, Cross-Origin-Resource-Policy: cross-origin, Date: Tue, 01 Jul 2025 00:14:45 GMT, Expires: Fri, 01 Jan 1990 00:00:00 GMT, and Pragma: no-cache. The displayed data provides verifiable network records evidencing the transmission path, header configuration, and endpoint identification of the observed exchange.

**Figure 11:**



150.  Figure 12 below shows a Network panel display containing multiple GET requests transmitted to the external host googleads.g.doubleclick.net, with entries labeled "1014544981/?ran...", "11081837180/?ra...", "11085496201/?ra...", "11395012419/?url...", "11442400124/?ra...", and "11395012419/?url..". The Request URL field displays https://googleads.g.doubleclick.net/pagead/…[full URL omitted], and the associated request data shows Request Method: GET, Status Code: 200 OK, and Remote Address: 192.178.155.155:443. The visible Response Headers include Alt-Svc: h3=":443"; ma=2592000,h3-29=":443"; ma=2592000, Cache-Control: no-cache, must-

revalidate, and Content-Disposition: attachment; filename="f.txt". The displayed data provides verifiable addressing, routing, and signaling metadata identifying the network path, endpoint address, and header parameters exchanged between the client and the referenced external domain.

**Figure 12**



151.   Figure 13 below shows a DNS log table listing sequential domain resolution events under the columns Time, Protocol, and Info. The entries display multiple standard queries and responses including maps.googleapis.com, www.googletagmanager.com, content-autofill.googleapis.com, analytics.google.com, stats.g.doubleclick.net, www.googleadservices.com, and googleads.g.doubleclick.net. Each domain is associated with visible IPv4 addresses returned in the DNS A records such as 74.125.135.95, 172.253.117.95, 216.239.36.181, 74.125.20.155, and 142.251.188.155. The log also shows CNAME resolution for analytics.google.com pointing to analytics-alv.google.com. The displayed data provides verifiable addressing and routing metadata showing the DNS-based resolution path, host identification, and IP address mapping

1    used to establish network connections between the client and each listed external

2    domain.

3                                              **Figure 13**



16    152.    Figure 14 below shows a cookie storage table listing paired fields under the

17    column headers Name, Value, Domain, Path, Expiration, and Size. The visible entries

18    include _abck with value 16967AB830078C84925957A281272E12-, _fbp with value

19    fb.1.1760083019486.492803700721947455,              _ga             with             value

20    GA1.1.210177262.1760083017,            _ga_KFP8T9JWYJ             with             value

21    GS2.1.s1760090202$o2$g0$t1760090202.., and          _gcl_au        with        value

22    1.1.1447734684.1760083015, each showing domains beginning with tesla. Additional

23    cookies listed include bm_lso, bm_s, bm_so, bm_ss, bm_sz, guest_id, guest_id_ads,

24    guest_id_marketing, ip_info, muc_ads, optimizelyEndUserId, and personalization_id,

25    which display domain fields referencing tesla., www., t.co, and twitt. These entries

26    visibly represent stored name–value pairs associated with specific domains and

27    expiration attributes. The displayed data provides verifiable addressing and signaling

1  metadata linking stored identifiers to distinct host domains, evidencing how session

2  parameters were maintained across the identified endpoints.

3  **Figure 14**



153.  Figure 15 below shows a request record labeled i134 displaying a 204
HTTPS transaction to the host analytics.google.com with the visible URL path
/g/colect/…[full URL omitted]. The headers panel lists paired fields including Accept:
/, Accept-Encoding: gzip, deflate, br, zstd, Accept-Language: en-US,en;q=0.9, and User-
Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64). Additional visible entries include
Content-Length: 0, Referer: https://www.tesla.com/…[full URL omitted], X-Browser-
Channel: stable, X-Browser-Copyright: Copyright 2025 Google LLC. All rights, X-
Browser-Validation: AGaxImjg97xQkd0h3geRTArJi8Y=, X-Browser-Year: 2025, and
Origin: https://www.tesla.com. Security and transport fields show sec-ch-ua: "Google
Chrome";v="141", "Not?A_Brand";v="8", sec-ch-ua-mobile: ?0, sec-ch-ua-platform:
"Windows", Sec-Fetch-Dest: empty, Sec-Fetch-Mode: no-cors, Sec-Fetch-Site: cross-
site, Sec-Fetch-Storage-Access: none, Connection: keep-alive, and Host:
analytics.google.com. The displayed data provides verifiable addressing, routing, and

1  signaling metadata identifying the request headers, origin, and endpoint parameters

2  governing the transmission between the client and the external domain.

3  **Figure 15**



16  154.  Figure 16 below shows a sequence of network requests numbered 170

17  through 180, displaying visible columns labeled Result, Protocol, Host, and URL. The

18  entries include HTTPS connections to www.googletagmanager.com,

19  www.googleadservices.com, googleads.g.doubleclick.net, www.google.com, t.co,

20  analytics.twitter.com, and www.tesla.com. The table shows specific URL paths such as

21  /gtag/destination…[full URL omitted], /pagead/conversion…[full URL omitted],

22  /pagead/viewthroughconverson…[full URL omitted], /pagead/1p-conversion…[full

23  URL omitted], and /1//adsct…[full URL omitted], with status results including 200, 201,

24  and 302 codes. The displayed data provides direct evidence of addressing and routing

25  metadata identifying distinct HTTPS exchanges between the client and multiple external

26  hosts, reflecting the endpoint addressing, request sequencing, and signaling transactions

27  that occurred during the observed session.

28

1

## Figure 16



155.    Figure 17 below shows a query string parameter table displaying visible entries under the columns Name, Headers Payload, Preview, Response, Initiator, and Timing. The listed rows include identifiers beginning with 10145, 11085, 11395, and 11442, each showing parameter strings containing visible fields such as random=17513288802718, cv=11, fst=1751328880271, bg=ffguid=ON, async=1, gcd=13t3t3t3t5l1, dma=0, tag_exp=101509157-103116026-103200004-103233427-10330821, and url=https%3A%2F%2Fwww.tesla.com%2Fcharging. Additional parameters appear as hn=www.googleadservices.com, ref=https%3A%2F%2Fwww.tesla.com%2F, and data=event%3Dgtag.config%3Bgtm_container%3DGTM-KMG5DM. These values are visibly presented as structured name–value pairs representing the query components transmitted from the client to the external host. The displayed data provides verifiable addressing, routing, and signaling metadata establishing the specific endpoint identifiers, source reference, and transmission structure for the recorded network exchange.

1

**Figure 17**



156.    Figure 18 below shows a request inspection panel displaying visible fields including    sauthority:    googleads.g.doubleclick.net,    :method:    GET,    :path: /pagead/viewthroughconversion/…[full URL omitted], and :scheme: https. Additional headers are shown including Accept: /, Accept-Encoding: gzip, deflate, br, zstd, Accept-Language: en-US,en;q=0.9, and Referer: https://www.tesla.com/…[full URL omitted]. The table also displays client-identifying and signaling headers including Sec-Ch-Ua: "Google Chrome",v="137", "Chromium",v="137", "Not/A)Brand";v="24", Sec-Ch-Ua-Mobile: ?0, Sec-Ch-Ua-Platform: "macOS", Sec-Fetch-Dest: script, Sec-Fetch-Mode: no-cors, Sec-Fetch-Site: cross-site, and Sec-Fetch-Storage-Access: active. The visible user    agent    string    is    Mozilla/5.0    (Macintosh;    Intel    Mac    OS    X    10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/137.0.0.0 Safari/537.36, and the X-Client-Data field includes encoded and decoded identifiers with visible variation_id values [3300113, 3300131, 3313321, 3325002, 3330195, 3330450, 3362822, 3390227]. The displayed data provides verifiable addressing, routing, and signaling metadata

1  establishing the host domain, header configuration, and transmission characteristics of
2  the HTTPS exchange between the client and the external server.

**Figure 18**



16  157.  Figures 16, 17, and 18 show that the Website triggered HTTPS requests
17  directed to external domains including https://www.google-analytics.com/…[full URL
18  omitted],    https://adservice.google.com/…[full    URL    omitted],    and
19  https://googleads.g.doubleclick.net/…[full URL omitted]. The network panels display
20  outbound GET and POST requests with query string parameters such as auid, dl, sr, and
21  ul, and include visible referrer headers identifying https://www.tesla.com/…[full URL
22  omitted]. The evidence in these figures shows that the user's browser exchanged
23  addressing, routing, and signaling data with the identified external hosts through HTTPS
24  connections. The displayed data provides verifiable network records evidencing the
25  transmission path, query parameters, and endpoint configuration of those exchanges.

26  158.  Figures 9 through 18 show a sequence of HTTPS network requests and
27  related  browser  events  that  include  visible  connections  to  domains  such  as
28  https://www.googletagmanager.com/…[full    URL    omitted],    https://www.google-

analytics.com/…[full URL omitted], and https://googleads.g.doubleclick.net/…[full URL omitted]. The associated panels display request headers, stored cookies (_ga, _gid, and _gcl_au), and referrer fields referencing https://www.tesla.com/…[full URL omitted]. Collectively, the figures document multiple addressing and signaling events in which the browser established and maintained connections with these domains. The displayed data constitutes direct evidence of network metadata reflecting the protocol exchanges, host identifiers, and session-related information transmitted between the client and external servers.

159.  Defendant surreptitiously installed and executed the Google Trackers onto users' browsers by embedding Google Tag Manager in the Website's source code. When a user visits the Website, their browser automatically executes this container script, which dynamically injects Google Analytics and initiates outbound network requests to Google's servers, transmitting metadata including page URL, referrer information, browser details, and session identifiers as part of a third-party tracking, profiling, and advertising system.

160.  The Google Trackers are at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

161.  The Google Trackers are at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, *e.g.*, *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

162.  The Google Trackers function as a pen register and/or trap and trace device under the California Invasion of Privacy Act because they capture outgoing signaling data such as URLs visited, click paths, timestamps, and referrer headers and also process incoming metadata such as analytics responses and cookie-based session identifiers. These transmissions occur automatically during page load and without user participation, enabling Google to continuously log user behavior and associate it with broader tracking profiles.

163.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Google Trackers on Plaintiff's and Class Members' browser or to collect or share data with Google.

164.    Consequently, the Google Trackers violate CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**2.    *The Twitter Tracker***

165.    The Twitter Tracker is a behavioral tracking and advertising script operated by X Corp. (formerly Twitter, Inc.), implemented on the Website through embedded calls to domains including ads-twitter.com, analytics.twitter.com, and t.co. The tracker loads automatically during the user's initial page visit and executes without any user action, establishing network connections to Twitter's servers that transmit browser, device, and session metadata in real time.

166.    When a user visits the Website, the Twitter Tracker executes automatically and transmits background requests to Twitter's advertising and analytics endpoints. These requests contain session-specific identifiers, request headers, and referrer information tied to the user's browsing activity. During this process, the user's browser is instructed to store several Twitter cookies—guest_id, guest_id_ads, and guest_id_marketing—all of which appear in the browser's cookie table for the session and share a consistent identifier value. These cookies persist beyond the session, enabling cross-visit recognition and data correlation.

167.    The data collected by the Twitter Tracker allows Twitter to identify users across sites and to synchronize activity on the Website with its ad targeting and analytics systems. These persistent identifiers facilitate correlation between a user's visit to the Website and their profile or device as recognized across Twitter's ad ecosystem, supporting delivery of customized advertising and engagement measurement.

168.    Figure 19 below shows a network activity table containing visible columns labeled Name, URL, Method, Domain, and Time. The entries list uwt.js with the URL

https://static.ads-twitter.com/uwt.js…[full URL omitted], and three separate GET requests to https://analytics.twitter.com/1/i/adsct…[full URL omitted], all displaying domains analytics.twitter.com with recorded times of 76 ms, 77 ms, and 79 ms. The data shows distinct HTTPS connections to static.ads-twitter.com and analytics.twitter.com with recorded timing intervals and full host references. The displayed data provides verifiable addressing, routing, and signaling metadata evidencing direct HTTPS exchanges between the client and the identified external endpoints.

**Figure 19**



169. Figure 20 below shows a request entry identifying the host analytics.twitter.com under the field :authority, with method GET and scheme https. The :path field displays /1/i/adsct…[full URL omitted], and visible request headers include Accept set to image/avif,image/webp,image/apng.image/svg+xml,image/,/*q=0.8, Accept-Encoding set to gzip, deflate, br, zstd, and Accept-Language set to en-US,en;q=0.9. The Referer header references https://www.tesla.com/…[full URL omitted], while Sec-Ch-Ua is shown as "Google Chrome";v="137", "Chromium";v="137", "Not/A)Brand";v="24", with Sec-Ch-Ua-Platform listed as

"macOS" and User-Agent recorded as Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/137.0.0.0 Safari/537.36. The displayed data captures the precise addressing and signaling metadata defining the browser's HTTPS request to analytics.twitter.com, evidencing the endpoint, header structure, and routing identifiers contained in the recorded transaction.

**Figure 20**



170. Figure 21 below shows an HTTPS request entry with the host field identified as analytics.twitter.com and the method recorded as GET. The path begins with /1/i/adsct…[full URL omitted], followed by visible query data containing fields including bci=4, dv=America%2FLos_Angeles, event_id=d044a66b-1c2d-473a-8080-e2ea5b4ab089, integration=gtm, p_id=Twitter, and tw_document_href=https%3A%2F%2Fwww.tesla.com%2Fcharging. Additional headers shown include :scheme listed as https, Accept recorded as image/avif,image/webp,image/apng.image/svg+xml,image/,/*q=0.8, Accept-Encoding set to gzip, deflate, br, zstd, Accept-Language set to en-US,en;q=0.9, Referer referencing https://www.tesla.com/…[full URL omitted], and User-Agent identifying Mozilla/5.0

1    (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)

2    Chrome/137.0.0.0 Safari/537.36. The displayed data constitutes direct evidence of

3    addressing and signaling metadata defining the browser's HTTPS exchange with

4    analytics.twitter.com, evidencing the endpoint identifiers, request parameters, and

5    routing information contained in the recorded transaction.

**Figure 21**



6

7

8

9

10

11

12

13

14

15

16

17

18

19    171.   Figure 22 below shows DNS query and response records corresponding to

20    requests for static.ads-twitter.com and analytics.twitter.com. The entry at time

21    35.949763 shows a standard DNS query identified as 0xff53 A static.ads-twitter.com,

22    followed by a response at 36.230635 showing 0xff53 A static.ads-twitter.com CNAME

23    platform.twitter.map.fastly.net A 146.75.40.157. A subsequent query at 37.846196 is

24    recorded as 0xaff5 A analytics.twitter.com, with a corresponding response at 38.131406

25    resolving analytics.twitter.com to CNAME s.twitter.com A 172.66.0.227. The displayed

26    data provides verifiable addressing and routing metadata documenting the hostname

27    resolutions and IP endpoints through which the client established network connections

28    to the external Twitter infrastructure.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED        56
CASE NO. 5:25-CV-01982-KK-SP

**Figure 22**



172.    Figure 23 below shows an HTTPS transaction directed to the host analytics.twitter.com. The Request URL field displays https://analytics.twitter.com/1/i/adsct/…[full URL omitted], with the Request Method listed as GET and the Status Code shown as 200 OK. The Remote Address is recorded as 172.66.0.227:443. Visible query parameters within the URL include fields such as bci=4, dv=America%2F Los_Angeles,    event_id=d044a66b-1c2d-473a-8080-e2ea5b4ab089,    integration=gtm, tp_id=Twitter,    p_user_id=0,    and    tw_document_href=https%3A%2F%2Fwww.tesla .com%2Fcharging. Response headers include Cache-Control set to no-cache, no-store, max-age=0, and Cf-Cache-Status listed as DYNAMIC. The displayed data provides verifiable network metadata establishing the addressing, signaling, and endpoint details of the HTTPS communication between the client browser and analytics.twitter.com.

1

**Figure 23**



173.    Figure 24 below shows a table of stored browser cookies listing multiple name–value pairs with associated domains and expiration attributes. Visible entries include _abck set to 16967AB830078C84. under the domain .tesla.com, _fbp set to fb.1.1760083019486. under .tesla.com, _ga set to GA1.1.210177262.17.. under .tesla.com, _ga_KFP8T9JWYJ set to GS2.1.s1760090202$. under .tesla.com, and _gcl_au set to 1.1.1447734684.176… under tesla.com. Additional entries include bm_lso, bm_s, bm_so, bm_ss, bm_sz, guest_id with the domain .twitter.com, guest_id_ads under twitter.com, guest_id_marketi... under .twitter.com, ip_info with the domain www.tesla.., muc_ads under .t.co, optimizelyEndUserId under .tesla.com, and personalization_id under twitter.com. The displayed data constitutes direct evidence of addressing and signaling metadata stored in the client environment, documenting the identifiers, domain associations, and expiration details that define session continuity and endpoint relationships within the network exchange.

**Figure 24**



174.    Figure 25 below shows network activity associated with requests to the host static.ads-twitter.com. The Request URL field identifies https://static.ads-twitter.com/uwt.js…[full URL omitted], with the Request Method recorded as GET and the Status Code shown as 200 OK. The Remote Address is listed as 146.75.92.157:443. Visible Response Headers include Accept-Ranges set to bytes, Cache-Control set to no-cache, Content-Encoding identified as gzip, Content-Length recorded as 15757, and Content-Type defined as application/javascript; charset=utf-8. Additional header fields shown include Date: Tue, 01 Jul 2025 00:14:39 GMT, Etag: "89be6341362180b7e00592aa62f11b75+gzip+gzip", Last-Modified: Mon, 28 Apr 2025 13:55:21 GMT, P3p: CP="CAO DSP LAW CURa ADMa DEVa TAla PSAa PSDa IVAa IVDa OUR BUS IND UNI COM NAV INT", Vary: Accept-Encoding,Host, X-Amz-Server-Side-Encryption: AES256, X-Cache: HIT, X-Served-By: cache-bur-kbur8200148-BUR, and X-Tw-Cdn: FT. The displayed data captures the addressing, routing, and signaling metadata defining the protocol, headers, and endpoint identifiers involved in this HTTPS transaction between the client and the twitter.com domain.

1

**Figure 25**



175.    Figures 19 through 25 show that when the homepage was loaded, the browser automatically created several separate HTTPS connections to Twitter-operated domains, including ads-twitter.com, analytics.twitter.com, and t.co. The network logs display requests and responses showing "200 OK" status codes, indicating successful exchanges, along with visible technical metadata such as referrer headers, full request URLs, and cookies labeled guest_id, guest_id_ads, guest_id_marketing, personalization_id, and ct0. These items represent addressing and signaling data that identify the user's browser instance, record navigation context, and maintain session continuity across visits. When transmitted together, such identifiers allow external servers to correlate on-site activity with prior or subsequent web interactions, thereby forming the foundation of behavioral tracking and targeted advertising systems. Viewed collectively, the figures document how the user's browser established multiple simultaneous connections to distinct Twitter endpoints that receive and associate interaction metadata in a structured, repeatable way characteristic of behavioral tracking infrastructure.

176.    Defendant embedded the Twitter Tracker in the Website's source code and allowed it to execute automatically upon user visit. The embedded JavaScript initiates outbound connections to Twitter's infrastructure, transmitting metadata including page URLs, referrer headers, browser identifiers, and timestamped session data to a third-party server. These transmissions occur in the background without any user interaction or authorization.

177.    The Twitter Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

178.    The Twitter Tracker is at least a "device" because in order for software to operate, it must be executed on a computing device. *See, e.g., James*, 2023 WL 7392285, at *13.

179.    The Twitter Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act by capturing outgoing signaling data such as URLs, referrers, timestamps, and cookie-based identifiers, as well as processing inbound metadata responses from Twitter's servers. These transmissions occur while the user's electronic communication is in transit, sharing addressing and routing information with a third party without consent or judicial authorization.

180.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Twitter Tracker on their browsers or to transmit their communications to Twitter. Consequently, the Twitter Tracker violates CIPA as an unauthorized use of a pen register and/or trap and trace device.

*3.    The StackAdapt Tracker*

181.    The    StackAdapt    Tracker,    delivered    via    domains    including sync.stackadapt.com and match.adsrvr.org, is a third-party behavioral tracking technology operated by StackAdapt Inc. On the Website, this tracker is embedded within third-party advertising code that executes automatically when a user visits the homepage. During    the    homepage    session,    the    browser-initiated    HTTPS    connections    to

StackAdapt's servers that exchanged addressing and session-identifying data such as IP address, referrer URL, and browser user-agent string. These transmissions occur automatically upon page load, without user interaction, and represent real-time behavioral tracking by which StackAdapt receives and associates user and device information from the Website with identifiers it maintains across other sessions or platforms.

182.   The StackAdapt Tracker engages in identity synchronization through its communication with external advertising domains such as match.adsrvr.org. This process exchanges identifiers between StackAdapt and partner platforms, allowing behavioral and device-level data collected on the Website to be correlated with broader advertising profiles stored within the partner's infrastructure. These synchronized exchanges form part of the real-time metadata pipeline through which the user's browser is linked to StackAdapt's identity graph and ad-targeting ecosystem.

183.   By initiating these network connections, the StackAdapt Tracker enables continuous monitoring of browser sessions for behavioral profiling and targeted advertising. The addressing, routing, and signaling information transmitted during these requests—such as domain lookups, redirects, and referrer data—constitutes the technical foundation of behavioral tracking, providing StackAdapt with information necessary to recognize, categorize, and retarget users based on observed activity patterns.

184.   The StackAdapt Tracker thus functions as a behavioral tracking process that captures user-level network metadata and transmits it to StackAdapt's servers as part of a commercial advertising exchange. The data collected provides actionable behavioral signals used to link user sessions, refine audience segmentation, and inform the delivery of personalized ads within the broader data broker ecosystem.

185.   Figure 26 below shows multiple HTTPS requests initiated by the browser to the domain tags.srv.stackadapt.com. The visible entries include resources named sa.css, sa.jpeg, js_tracking?url-https%3A%2F%2Fwww.tesla.com&u.i., saq_pxl?uid=3Gpf9oy3zPhYmAUZ6p93Zw8vis_js=tn.., and events.js, all retrieved using the GET

1    method. Each entry records the destination domain tags.srv.stackadapt.com and a

2    corresponding execution time between 0 ms and 108 ms. The displayed data constitutes

3    direct evidence of addressing, routing, and signaling metadata demonstrating that the

4    user's browser established and maintained live connections with StackAdapt's remote

5    host and transmitted session-level identifiers as part of the observed network exchanges.

6    **Figure 26**



7

8

9

10

11

12

13

14

15

16

17

18

19    186.    Figure 27 below shows a recorded HTTPS request from the browser to the

20    domain tags.srv.stackadapt.com. The visible Request URL is https://tags.srv.stackadapt

21    .com/saq_pxl/…[full URL omitted], transmitted using the GET method and returning a

22    200 OK status code. The entry identifies the Remote Address 44.195.201.34:443 and

23    includes response headers such as Access-Control-Allow-Credentials: TRUE, Access-

24    Control-Allow-Headers: *, Access-Control-Allow-Methods: GET, and Access-Control-

25    Allow-Origin: https://login.zoominfo.com. These paired field values represent

26    addressing, routing, and signaling metadata associated with a live connection between

27    the user's browser and StackAdapt's remote server. The displayed data provides

28

verifiable network records evidencing the transmission path, header configuration, and endpoint identification of the observed exchange.

**Figure 27**



187.    Figure 28 below shows the browser's request headers for a GET request to https://tags.srv.stackadapt.com/saq_pxl/…[full URL omitted]. The visible header fields include :authority: tags.srv.stackadapt.com, :method: GET, :scheme: https, and :path: /saq_pxl?...[full URL omitted], followed by Accept: /, Accept-Encoding: gzip, deflate, br, zstd, Accept-Language: en-US,en;q=0.9, Origin: https://login.zoominfo.com, Priority: u=1,i, Sec-Ch-Ua: "Google Chrome";v="137", "Chromium";v="137", "Not/A)Brand";v="24", Sec-Ch-Ua-Mobile: ?0, Sec-Ch-Ua-Platform: "macOS", Sec-Fetch-Dest: empty, Sec-Fetch-Mode: cors, Sec-Fetch-Site: cross-site, Sec-Fetch-Storage-Access: active, and User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/137.0.0.0 Safari/537.36. These header fields define the signaling metadata and protocol context of the request between the user's browser and the StackAdapt server. The displayed data

captures the precise signaling and addressing metadata exchanged in the process of

establishing and maintaining this cross-site HTTPS connection.

**Figure 28**



188.   Figures 26 through 28 collectively show that when a user visits the Tesla

website, the browser automatically initiates multiple HTTPS requests to the third-party

domain tags.srv.stackadapt.com. These requests include calls to files such as sa.css,

sa.jpeg, events.js, and a request to the /saq_pxl endpoint that transmits identifiers and

URL parameters referencing both tesla.com and login.zoominfo.com. The StackAdapt

server responds with standard access-control headers allowing cross-origin

communication with ZoomInfo's domain, confirming active bidirectional signaling

between the user's browser and external advertising infrastructure. The visible

addressing, routing, and signaling data—including referrer, origin, and user-agent

fields—demonstrate that the user's device exchanged metadata with StackAdapt's

servers immediately upon page load. This type of automatic metadata exchange reflects

behavioral tracking, as it transmits browser-level identifiers and referrer information

1    capable of linking individual browsing sessions to behavioral and identity profiles

2    maintained by third-party advertising networks.

3        189.    StackAdapt uses the metadata exchanged during these requests to function

4    simultaneously as a demand-side platform and a data broker. In its DSP role, StackAdapt

5    analyzes these signals in real time to classify users, bid on ad impressions, and deliver

6    personalized advertising based on observed browsing behavior. As a data broker, it

7    aggregates and cross-references identifiers collected across websites with external

8    datasets to build persistent behavioral and demographic profiles. These profiles are

9    shared within the programmatic advertising ecosystem to enable cross-site targeting,

10   identity resolution, and monetization of user activity through behavioral tracking and

11   audience segmentation.

12       190.    Defendant surreptitiously installed, executed, embedded, or injected the

13   StackAdapt Tracker onto users' browsers by deploying third-party advertising code that

14   triggers communication with StackAdapt's tracking infrastructure. When a user visits

15   the Website, their browser automatically executes this code, initiating outbound requests

16   to StackAdapt's servers and transmitting user metadata including IP address, referrer

17   URL, and unique user identifiers. These transmissions occur silently and without any

18   user action, enabling StackAdapt to observe and record user interactions on the Website

19   in real time.

20       191.    The StackAdapt Tracker is at least a "process" because it is software that

21   identifies users, gathers data about their browsing activity, and correlates that data across

22   multiple sources and sessions.

23       192.    The StackAdapt Tracker is at least a "device" because, in order for software

24   to function, it must be executed on some kind of computing device. *See, e.g., James*,

25   2023 WL 7392285, at *13.

26       193.    The StackAdapt Tracker initiates connections to its infrastructure during a

27   user session via pixel and script execution. It captures metadata including device

28

1  identifiers, page path, timestamps, and partner identifiers, all of which constitute

2  addressing, routing, and signaling information under CIPA.

3      194.  The user does not intentionally initiate any communication with

4  StackAdapt. The connection is automatically triggered in the background by third-party

5  advertising code embedded on the Website. StackAdapt receives and records

6  communication-related data generated during the user's interaction with the Website.

7  The StackAdapt Tracker functions as a surveillance mechanism that captures and

8  transmits signaling information for data-brokering and programmatic advertising

9  purposes.

10      195.  Defendant never obtained a court order permitting the installation of a pen

11  register or trap and trace device or process and did not obtain Plaintiff's or the Class

12  Members' express or implied consent to install the StackAdapt Tracker on their browsers

13  or to collect or share data with StackAdapt.

14      196.  Consequently, the StackAdapt Tracker violates CIPA regarding the

15  unauthorized use of a pen register and/or trap and trace device without prior consent or

16  court order.

17              **VI.    CLASS ALLEGATIONS**

18      197.  Plaintiff brings this action individually and on behalf of all others similarly

19  situated (the "Class" or "Class Members") defined as follows:

20          All persons within California whose browser was subject to installation,

21          execution, embedding, or injection of the Trackers by the Defendant's

22          Website during the relevant statute of limitations period.

23      198.  The Class does not include (1) Defendant, its officers, and/or directors; (2)

24  the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's

25  staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

26      199.  Plaintiff reserves the right to amend the above class definition and add

27  additional classes and subclasses as appropriate based on investigation, discovery, and

28  the specific theories of liability.

200. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

201. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

202. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

203. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

1    204.  **SUPERIORITY:**  A class action is superior to other available methods of

2    adjudication because individual litigation of the claims of all Class Members is

3    impracticable and inefficient. Even if every Class Member could afford individual

4    litigation, the court system could not. It would be unduly burdensome to the courts in

5    which individual litigation of numerous cases would proceed. Individualized litigation

6    also presents a potential for inconsistent or contradictory judgments.

7    ## VII.  <u>FIRST CAUSE OF ACTION</u>

8    ### Violations of Cal. Penal Code § 638.51

9    ### *By Plaintiff and the Class Members Against Defendant*

10    205.  Plaintiff reasserts and incorporates by reference the allegations set forth in

11    each preceding paragraph as though fully set forth herein.

12    206.  Plaintiff brings this claim individually and on behalf of the members of the

13    proposed Class against Defendant.

14    207.  Defendant uses a pen register device or process and/or a trap and trace

15    device or process on its Website by deploying the Trackers because the Trackers are

16    designed to capture the IP address, User Information, and other information such as the

17    phone number, email, routing, addressing and/or other signaling information of website

18    visitors.

19    208.  Defendant did not obtain consent from Plaintiff or any of the Class

20    Members before using pen registers or trap and trace devices to locate or identify users

21    of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory

22    penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educ. Sys.*

23    *Inc.*, 742 F. Supp. 3d 1072 (C.D. Cal. 2024).

24    ## VIII.  <u>PRAYER FOR RELIEF</u>

25    WHEREFORE, Plaintiff prays for the following:

26        1.  An order certifying the Class, naming Plaintiff as Class

27            representative, and naming Plaintiff's attorneys as Class counsel;

28        2.  An order declaring that Defendant's conduct violates CIPA;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5. Disgorgement of profits resulting from unjust enrichment;

6. Statutory damages pursuant to CIPA;

7. Prejudgment interest;

8. Reasonable attorney's fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Dated:   October 16, 2025          Respectfully submitted,

**BURSOR & FISHER, P.A.**


By: */s/ L. Timothy Fisher*
        L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
           dguerra@bursor.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan, Esq. (SBN 208436)
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*