**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            dguerra@bursor.com

Reuben D. Nathan, Esq. (State Bar No. 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (State Bar No. 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER DAWIDZIK, on behalf of himself and all similarly situated persons,<br><br>                                        Plaintiff,<br><br>       v.<br><br>TESLA, INC., a Texas corporation,<br><br>                                        Defendant. | Case No. 5:25-cv-01982-KK-SP<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br>Hearing Date:  December 18, 2025<br>Time:  9:30 a.m. PT<br>Courtroom:  3<br>Judge:  Hon. Kenly Kiya Kato |

1
2

# TABLE OF CONTENTS

PAGE(S)

I.  INTRODUCTION ................................................................................ 1

II. FACTUAL BACKGROUND ............................................................. 2

III. PROCEDURAL HISTORY ............................................................... 2

IV. ARGUMENT ..................................................................................... 3

    A.  Defendant's Installation and Use of the Trackers Injured Plaintiff Within the Meaning of CIPA .......................................... 3

        1.  Plaintiff Has an Interest in Preventing the Uncontrolled Dissemination of Personal Information ................. 3

        2.  Defendant Was Unjustly Enriched Through Its Installation and Use of the Third-Party Trackers ....................... 9

    B.  The Court has Personal Jurisdiction over Defendant .......................... 11

        1.  Tesla Expressly Aimed Its Tracking Conduct at California Users ................................................................ 11

        2.  The Illegal Interception Occurred on Plaintiff's Device in California ............................................................. 12

        3.  The FAC Pleads Tesla Uses the Data for Marketing, Profiling, and Monetization ........................................ 12

        4.  Tesla's Conduct Creates a California-Specific Harm ............... 12

        5.  Defendant Purposefully Availed Itself of California's Laws and Benefits ............................................ 13

        6.  Plaintiff's Claims Arise Out of Defendant's Contacts with California ...................................................... 15

        7.  The Exercise of Jurisdiction Comports with Fair Play and Substantial Justice ............................................ 15

    C.  The Court Should Not Dismiss For Failure To State A Claim ............................................................................... 17

        1.  The FAC Pleads the Digital Equivalents of Dialing, Routing, Addressing, and Signaling Information ................. 18

        2.  The Interception Is Not "Voluntary" Disclosure ..................... 19

        3.  Plaintiff Pleads Non-Content DRAS Information .................... 19

        4.  The Data Is User-Specific Because Identity Resolution and Reidentification Are Built-In ............................ 20

V.  CONCLUSION ................................................................................. 22

1

# TABLE OF AUTHORITIES

2

**PAGE(S)**

3

**CASES**

4

*Aviles v. Liveramp, Inc.*,
 2025 WL 487196 (Cal. Super. Ct. Jan. 28, 2025).....................................22

5

6

*Briskin v. Shopify, Inc.*,
 135 F.4th 739 (9th Cir. 2025)..................................................................passim

7

8

*Burger King Corp. v. Rudzewicz*,
 471 U.S. 462 (1985) .................................................................................... 16

9

10

*Calder v. Jones*,
 465 U.S. 783 (1984) .................................................................................... 12

11

12

*Camplisson v. Adidas Am., Inc.*,
 2025 WL 3228949 (S.D. Cal. Nov. 18, 2025) ............................................ 9

13

14

*Deivaprakash v. Conde Nast Digital*,
 2025 WL 2779193 (N.D. Cal. Sept. 30, 2025) ........................................... 8

15

16

*DellaSala v. Samba TV, Inc.*,
 2025 WL 3034069 (N.D. Cal. Oct. 30, 2025)......................................... 3, 8

17

*Dept. of Justice v. Reporters Committee For Freedom of Press*,
 489 U.S. 749 (1989) ...................................................................................... 5

18

19

*Eichenberger v. ESPN, Inc.*,
 876 F.3d 979 (9th Cir. 2017)........................................................................ 9

20

21

*Ford Motor Company v. Montana Eighth Judicial District*,
 592 U.S. 351 (2021) .................................................................................... 14

22

23

*Frasco v. Flo Health, Inc.*,
 349 F.R.D. 557 (N.D. Cal. 2025) ........................................................... 5, 8

24

25

*Gabrielli v. Haleon US Inc.*,
 2025 WL 2494368 (N.D. Cal. Aug. 29, 2025).......................................9, 11

26

27

*Gabrielli v. Motorola Mobility LLC*,
 2025 WL 1939957 (N.D. Cal. July 14, 2025).................................... 5, 8, 14

28

---

*Garon v. Keleops USA, Inc.*,
    2025 WL 2522374 (N.D. Cal. Sept. 2, 2025) ........................................................ 18

*Greenley v. Kochava, Inc.*,
    684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......................................................... passim

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ................................................................... 1, 4, 9

*Katz-Lacabe v. Oracle Am., Inc.*,
    668 F. Supp. 3d 928 (N.D. Cal. 2023) .................................................................. 5, 8

*Khamooshi v. Politico LLC*,
    2025 WL 2822879 (N.D. Cal. Oct. 2, 2025) .............................................................. 9

*Leon v. URL Pharma, Inc.*,
    692 F. Supp. 3d 973 (C.D. Cal. 2023) ................................................................ 15, 16

*Lesh v. Cable News Network, Inc.*,
    767 F. Supp. 3d 33 (S.D.N.Y. 2025) ................................................................... 17, 22

*McClung v. AddShopper, Inc.*,
    2024 WL 189006, fn.1 (N.D. Cal. Jan. 17, 2024) ...................................................... 5

*Mirmalek v. Los Angeles Times Commc'ns LLC*,
    2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) ........................................................ 1, 4, 21

*Mitchener v. Talkspace Network LLC*,
    2025 WL 1822801 (C.D. Cal. June 27, 2025) ............................................................. 4

*Moody v. C2 Educ. Sys. Inc.*,
    742 F. Supp. 3d 1072 (C.D. Cal. 2024) ................................................................. 4, 22

*Moody v. Textron Inc.*,
    2025 WL 2025597 (C.D. Cal. July 2, 2025) ............................................................. 13

*Popa v. Microsoft Corp.*,
    153 F.4th 784 (9th Cir. 2025) .......................................................................... 3, 6, 7

*R.C. v. Sussex Publishers, LLC*,
    2025 WL 948060 (N.D. Cal. Mar. 28, 2025) ............................................................. 3

*Riganian v. LiveRamp Holdings, Inc.*,
    2025 WL 2021802 (N.D. Cal. July 18, 2025) .......................................................... 1, 5, 6

*Rodriguez v. Autotrader.com, Inc.*,
   762 F. Supp. 3d 921 (C.D. Cal. 2025) .................................................. 10, 22

*Roney v. Miller*,
   705 F. App'x 670 (9th Cir. 2017) ........................................................ 22

*Shah v. Fandom, Inc.*,
   754 F. Supp. 3d 924 (N.D. Cal. 2024) ............................................ passim

*Walden v. Fiore*,
   571 U.S. 277 (2014) ........................................................................ 12

*Wooten v. BioLife Plasma Services L.P.*,
   2025 WL 2979619 (E.D. Cal. Oct. 22, 2025) ........................................ 9

*Zarif v. Hwareh.com, Inc.*,
   789 F. Supp. 3d 880 (S.D. Cal. 2025) ................................................ 22

**STATUTES**

Cal. Pen. Code § 638.50 ................................................................ passim

Cal. Pen. Code § 638.51(a) .................................................................. 17

1

## I.  INTRODUCTION

2      Defendant Tesla, Inc. ("Defendant" or "Tesla") seeks dismissal of Plaintiff

3   Peter Dawidzik's First Amended Complaint ("FAC"), ECF No. 23, by raising three

4   arguments: (1) that Plaintiff lacks standing; (2) that the Court lacks personal

5   jurisdiction over Defendant; and, (3) that the trackers at issue do not constitute pen

6   registers or trap-and-trace devices under the California Invasion of Privacy Act

7   ("CIPA").

8      ***First,*** Defendant's argument that Plaintiff suffered no injury is foreclosed by

9   binding precedent.  The FAC alleges that Defendant enabled third-party trackers (the

10   "Trackers") that, *inter alia*, intercepted and monetized his behavioral information

11   without consent.  FAC ¶¶ 2–3, 6–9, 11–12.  Courts have consistently recognized that

12   loss of control over personal data, coupled with its commercial exploitation,

13   constitutes a concrete and particularized injury sufficient to confer standing.  *See In*

14   *re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598-99 (9th Cir. 2020);

15   *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802 at *6 (N.D. Cal. July 18,

16   2025).

17      ***Second,*** Defendant argues that the claims should be dismissed because Court

18   lacks specific personal jurisdiction.  This argument is unavailing because, as alleged

19   in the FAC, Defendant targets its website towards California consumers.  FAC ¶¶

20   17-23.

21      ***Third,*** Defendant argues that CIPA § 638.51 is limited to traditional

22   telephone-era devices.  But CIPA expressly covers any "device or process" that

23   records or decodes dialing, routing, addressing, or signaling information.  FAC ¶¶

24   27-35.  The weight of authority has applied this definition to modern tracking

25   technologies, including cookies, pixels, and software scripts.  *See Shah v. Fandom,*

26   *Inc.*, 754 F. Supp. 3d 924, 930-31 (N.D. Cal. 2024); *Greenley v. Kochava, Inc.*, 684

27   F. Supp. 3d 1024, 1050 (S.D. Cal. 2023); *Mirmalek v. Los Angeles Times Commc'ns*

28   *LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024).  As a remedial statute

designed to protect privacy in light of advancing technology, CIPA's text and
legislative history demonstrate that it must be construed broadly to safeguard privacy
in the face of evolving surveillance technologies.  FAC ¶¶ 27-35.

## II.    FACTUAL BACKGROUND

Plaintiff Peter Dawidzik ("Plaintiff") is a California resident who visited
www.tesla.com (the "Website") on multiple occasions, including July 1, 2025, for
personal purposes.  FAC ¶ 16.  Unbeknownst to users, including Plaintiff, Defendant
embedded and executed third-party trackers operated by Google LLC, X Corp., and
StackAdapt Inc. (the "Third Parties") on the Website.  FAC ¶¶ 6, 8.

In capturing Plaintiff and Class Members' routing and signaling information
as well as their personal and private behavioral information, the Trackers functioned
as pen registers and trap-and-trace devices under California Penal Code § 638.50.
FAC ¶ 10.  Likewise, Google LLC, X Corp., and StackAdapt Inc. used the exfiltrated
data to enrich persistent behavioral profiles and track users across the internet for
targeted advertising.  FAC ¶¶ 9, 11.

Plaintiff and Class Members did not consent to the installation or execution of
the Trackers.  FAC ¶ 12.  Defendant also did not obtain the judicial authorization
required under CIPA.  FAC ¶ 13.  Plaintiff reasonably expected his behavioral
information, including his browsing and areas of interest, to remain private, not to be
intercepted and monetized.  By enabling the Trackers, Defendant deprived Plaintiff
of control over his information, caused its commercial exploitation, and violated
state law.  FAC ¶¶ 12-13, 36-38.

## III.    PROCEDURAL HISTORY

Plaintiff filed this putative class action on July 31, 2025 (Case No. 5:25-cv-
01982-KK-SP).  Defendant responded with a motion to dismiss under Rules
12(b)(1), 12(b)(2), and 12(b)(6), arguing lack of standing, failure to allege personal
jurisdiction, and that the technologies at issue do not constitute pen registers or trap-
and-trace devices under CIPA.  On October 16, 2025, Plaintiff filed the operative

First Amended Complaint, which bolstered the allegations regarding the identity of the Trackers, their operators, the nature of the data exfiltrated, and why that data qualifies as routing, addressing, and signaling information under CIPA's pen register and trap-and-trace provisions. FAC ¶¶ 1-208. The FAC provided detailed technical allegations showing how the Trackers automatically capture and transmit behavioral metadata and other routing information to third-party advertising and data broker servers without user awareness or consent. Defendant renewed its Motion to Dismiss ("MTD" or "Motion"), ECF No. 25, on October 30, 2025, reasserting the same three arguments.

## IV.    ARGUMENT

### A.    Defendant's Installation and Use of the Trackers Injured Plaintiff Within the Meaning of CIPA

#### 1.    Plaintiff Has an Interest in Preventing the Uncontrolled Dissemination of Personal Information

Defendant argues that Plaintiff "lacks standing to pursue his claims" due to a lack of concrete injury. MTD at 4. Defendant is mistaken. Longstanding caselaw establishes that a statutory privacy violation gives rise to Article III standing under CIPA and, contrary to Defendant's claims, the Ninth Circuit's decision in *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025), "did not set forth a new rule of law—the issue of whether a privacy violation gives rise to an injury-in-fact for purposes of Article III standing is a frequent feature in these cases." *DellaSala v. Samba TV, Inc.*, 2025 WL 3034069, at *2 (N.D. Cal. Oct. 30, 2025) (concluding the plaintiffs had adequately alleged harm to their privacy interests and thus an injury for purposes of Article III standing).

"In determining statutory standing under CIPA, courts have held IP address collection for targeted advertisement creates a concrete injury-in-fact." *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060 at *3 (N.D. Cal. Mar. 28, 2025); *see also Shah*, 754 F. Supp. 3d at 932 (finding statutory standing where plaintiffs plausibly

alleged, *inter alia*, the collection of their IP addresses); *Mirmalek*, 2024 WL 5102709 at *4 (same). This is also true of device information and other user identifiers. *See, e.g.*, *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1077-1078 (C.D. Cal. 2024) (finding collection of "browser and device data" by third-party tracker created statutory standing).

CIPA protects individuals against the loss of an "individual's control of information concerning his or her person." *In re Facebook*, 956 F.3d at 598 (cleaned up). And "[i]dentifiers such as a … unique personal identifier, online identifier, [and] Internet Protocol address" are "personal information" because they "identif[y] … or could reasonably be linked, directly or indirectly, with a particular consumer or household." Civ. Code § 1798.140, subd. (v)(1). The Central District of California followed this reasoning in *Mitchener v. Talkspace Network LLC*, 2025 WL 1822801 (C.D. Cal. June 27, 2025). The *Mitchener* court held that allegations of tracking "browsing activities, including an individual's likes, dislikes, interests, and habits over a significant amount of time" were sufficient to allege a privacy injury. *Mitchener*, 2025 WL 1822801 at *7.

Here, the FAC alleges that Defendant embedded its website with executable trackers—trackers that run on users' devices, collect routing, addressing, and signaling information, and, similar to the tracking at issue in *Mitchner*, transmit behavioral data to third parties in real time. FAC ¶¶ 150, 153, 156-57, 168, 174, 183, 185-86, 188. As the FAC explains, IP addresses are indispensable for directing communications while also permitting geolocation down to city, ZIP code, or even service area levels. FAC ¶¶ 73. These allegations confirm that the IP addresses and device metadata collected by the Trackers are the functional equivalent of call-routing records—the precise type of signaling information that CIPA's trap-and-trace and pen-register provisions intend to protect. *See* Argument § C, *infra*.

The harm is that, through the information the Third Parties collect, Website users are de-anonymized and linked to comprehensive, non-anonymous profiles

maintained by data brokers—profiles that are offered up for sale to a near endless supply of advertisers.  *McClung v. AddShopper, Inc.*, 2024 WL 189006 at *2, fn.1 (N.D. Cal. Jan. 17, 2024) ("The whole idea of AddShopper's scheme is to tie browsing activity on one site with personal information disclosed on another site."); *see also*, *e.g.*, FAC ¶¶ 96-99, 111, 113.  Plaintiff is harmed by this unauthorized and uncontrolled dissemination of his personal information.

Courts have routinely found such allegations to suffice for Article III standing. *Riganian*, 2025 WL 2021802 at *6 ("[T]he tracking of individuals' activity across thousands of websites, combined with extensive offline records gathered over decades, to generate uniquely identifying profiles on those individuals is sufficient to allege intrusion into privacy."); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025) ("Gabrielli's allegations that Motorola deprived him control of personal information regarding his digital activity and profile are sufficient to establish a concrete injury to his right to privacy and confer standing."); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (finding Article III standing based on "Oracle's ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers") (cleaned up).  This is so because, through Defendant's installation and use of the Trackers, Plaintiff has "lost control over [plaintiff's] private information because of another's intentional actions."  *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 580 (N.D. Cal. 2025).  As the Supreme Court has recognized, "both the common law and literal understandings of privacy encompass the individual's control of information concerning his or her person."  *Dept. of Justice v. Reporters Committee For Freedom of Press*, 489 U.S. 749, 763 (1989).

Harm can be based on either the disclosure of "specific, sensitive information" or that the third party "acquired an enormous amount of individualized data" as a result of Defendant's conduct.  *Riganian*, 2025 WL 2021802 at *6.  Plaintiff's allegations fall into the latter category, *see* FAC ¶¶ 96-99, as Defendant's installation

of the Trackers caused "comprehensive aggregation of data that reveals a person's internet activity with specificity." *Riganian*, 2025 WL 2021802 at *6.

Defendant's reliance on *Popa* is misguided.  The *Popa* court explicitly declined to "revisit *Eichenberger* and *In re Facebook* in reaching [its] decision," leaving them and their progeny good law because "those decisions still accounted for the individual circumstances giving rise to the plaintiffs' alleged injuries rather than simply greenlighting a per se rule for privacy statutes."  *Popa v. Microsoft Corporation*, 153 F.4th 784, 794 (9th Cir. 2025).

The instant case is more analogous to *In re Facebook* than to *Popa*.  Like the instant case, *In re Facebook* involved a tracker "that track[ed] users' browsing histories when they visit[ed] third-party websites, and then compile[d] these browsing histories into personal profiles which [were] sold to advertisers." *Id.* (internal quotation and citation omitted).  Plaintiff alleges a modern digital analogue of intrusion upon seclusion, which satisfies *Popa's* requirement of identifying a close historical common-law analogue.  The FAC states that Tesla causes hidden Trackers to install surveillance scripts on visitors' devices, which immediately begin extracting identifiers, cross-device data, behavioral information, and routing signals the moment a user loads any page of Tesla's website.  FAC ¶¶ 2–3, 39–45.  Plaintiff alleges Tesla "covertly transmits" his device's IP address, location-revealing information, detailed browser fingerprinting attributes, and cross-session identifiers to Google, X/Twitter, and StackAdapt "without consent and without disclosure." *Id.* ¶¶ 9–12, 44–45, 73–82.  Plaintiff further alleges that these transmissions enable the trackers to generate a persistent behavioral dossier on him, including location, device identity, and session-level activity. *Id.* ¶¶ 74–80.  This is the functional equivalent of secretly monitoring a person's activities within a private digital space—conduct the Restatement and California courts have long recognized as a highly offensive intrusion.

Moreover, *Popa* involved tracking via "session-replay technology." This technology "allows a business to capture and reproduce customers' interactions with its website," and "[t]he session-replay provider then uses those website communications to recreate website visitors' entire visit to the website." *Popa*, 153 F.4th 784, 786 (cleaned up). "A business utilizing this technology can then access useful consumer data, including detailed heat maps of a website that provide information about which elements of a website have high user engagement how far website users scrolled on the website, and the total clicks within a given area of the website." *Id.* As the Ninth Circuit explained, this technology "seem[ed] most similar to a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales." *Id.*, at 791.

To be sure, the plaintiff in *Popa* alleged this technology "captured" the specific "product" the user viewed on the website—*i.e.*, the user's browsing information. *Id.*, at 786–87. But crucially, the plaintiff also alleged this information was *anonymous*. *Id.* ("While Popa also alleges that a user's mailing address is captured when entered for delivery information, the screenshot produced in the complaint indicates that masking software … omitted the street number and zip code."). So, *Popa* boiled down to a third party collecting anonymous browsing information that was used by the website to troubleshoot technical issues.

As the Popa court explained, "the kind of analysis contemplated by *TransUnion* … requires a plaintiff to demonstrate more than just a statutory violation when evaluating whether a plaintiff has alleged a concrete injury." *Popa*, 153 F.4th at 793. Significantly, unlike the instant case, plaintiff in *Popa* did not allege that their information was de-anonymized, linked to comprehensive, individualized profiles maintained by data brokers, and sold to third-party advertisers. *See* FAC ¶¶ 91–99, 111, 113. Tesla's argument that the FAC alleges "only metadata" is contradicted by Plaintiff's detailed factual allegations. Plaintiff alleges Tesla's trackers collect location-revealing public IP addresses, which permit household-level

geolocation and user identification with over 95% accuracy. *Id*. ¶¶ 45–65. Plaintiff also pleads that the trackers obtain device fingerprinting details—including screen dimensions, system fonts, time zone, language, installed technologies, compression capabilities, and other unique attributes—making reidentification highly accurate. *Id*. ¶¶ 77–80. He alleges the trackers extract and transmit behavioral signals, such as URLs visited, page categories, clickstream patterns, and session behavior. *Id*. ¶¶ 5, 9, 43, 76–82.

The FAC also pleads that Tesla's chosen partners Google, X/Twitter, and StackAdapt use this combination of identifiers and behaviors to conduct identity resolution, cross-site matching, and behavioral profiling. *Id*. ¶¶ 10–12, 74, 80–82, 99–108. Plaintiff alleges the data is sensitive, specific, person-identifiable, and commercially exploited—precisely the type of information *Popa* emphasized may qualify as a concrete injury. Courts have found that such loss of control over one's information is a privacy harm. *See. e.g., Frasco v. Flo Health*, Inc., 349 F.R.D. 557, 580 (N.D. Cal. May 19, 2025); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 940 (N.D. Cal. 2023); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025).[1] Contrary to Defendant's assertions, this has remained true even after the *Popa* decision. "*Popa* did not set forth a new rule of law—the issue of whether a privacy violation gives rise to an injury-in-fact for purposes of Article III standing is a frequent feature in these cases." *DellaSala v. Samba TV, Inc.*, 2025 WL 3034069, at *2 (N.D. Cal. Oct. 30, 2025); *see also Deivaprakash v. Conde Nast Digital*, 2025 WL 2779193, at *1–2 (N.D. Cal. Sept. 30, 2025) (finding that plaintiff's alleged injuries of "how the trackers allow the third parties to generate profiles that reflect users' geographic locations, incomes, and

---

[1] Tesla may argue *Gabrielli* involved a healthcare context, but the tracker-based injury principle applies across all industries. The identity-resolution and de-anonymization claims here are identical to *Gabrielli's* theory.

preferences, among other characteristics, and hinder users' ability to remain anonymous as they browse the Internet" … "satisfie[d] the requirements of *Popa*.").

Plaintiff pleads he lost the ability to restrict, manage, or prevent Tesla's disclosure of his identity, location, and behavioral information to third parties.  FAC ¶¶ 12, 76–82, 95–107.  These allegations represent a loss-of-control injury that the Ninth Circuit recognizes as inherently concrete under privacy-invasion jurisprudence.  *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017); *In re Facebook Tracking*, 956 F.3d 589 (9th Cir. 2020); *Camplisson v. Adidas Am., Inc.*, 2025 WL 3228949, at *6 (S.D. Cal. Nov. 18, 2025) ("Plaintiffs have alleged that the Trackers on Defendant's website have collected a broad set of their personal identifying and addressing information without their consent and in violation of CIPA.[2]  This claim maintains a violation of privacy, particularly in the control of their own information.  Thus, the injury-in-fact is in accordance with traditional privacy harms and is concrete.  Plaintiffs do not lack Article III standing."); *Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *8 (N.D. Cal. Aug. 29, 2025) (same).  Thus, unlike the minimal, anonymized collection *Popa* cautioned against, Plaintiff alleges Tesla's conduct reflects the same kind of intentional, covert, and identity-linked surveillance that historically supported intrusion-upon-seclusion claims.  Like the allegations in these post-*Popa* cases, Plaintiff's FAC sufficiently alleges concrete injury to establish Article IIII standing.  *See supra* and *infra* § IV.A.2.

## 2. <u>Defendant Was Unjustly Enriched Through Its Installation and Use of the Third-Party Trackers</u>

In addition to privacy injuries, the FAC alleges economic injury analogous to misappropriation or conversion.  Plaintiff alleges that Defendant derived an unlawful

---

[2] Defendant's reliance on *Khamooshi v. Politico LLC*, 2025 WL 2822879 (N.D. Cal. Oct. 2, 2025) and *Wooten v. BioLife Plasma Services L.P.*, 2025 WL 2979619, at *3 (E.D. Cal. Oct. 22, 2025) is misplaced.  They are distinguishable because neither involved allegations of de-anonymization, identity resolution, or data-broker profiling.  Here, Plaintiff explicitly alleges comprehensive behavioral profiling through cross-site matching and data-broker aggregation.  FAC ¶¶ 99–108, 128–137.

economic benefit through its installation and use of the Trackers.  Plaintiff pleads
that Tesla and its tracking partners treat his personal data as a monetizable
commodity and profit from its use in targeted advertising, real-time bidding,
retargeting, and audience segmentation.  FAC ¶¶ 9–12, 84–90, 92–95.  He alleges
that his browsing behavior, identifiers, and cross-session patterns have monetary
value, and Tesla wrongfully appropriated that value without consent.  *Id*. ¶¶ 88–90,
95–107.  This fits squarely within the type of misappropriation-of-value injury
recognized as concrete by *In re Facebook* and consistently upheld post-*TransUnion*.
Specifically, Plaintiff alleges that by installing and using the Trackers, Defendant
caused Plaintiff's information to be collected by the Third Parties without Plaintiff's
consent.  Defendant benefitted from this because the Trackers de-anonymized
Plaintiff, enabling the collected information to be sold to advertisers for a higher
value.  *See, e.g.*, *Id*. ¶ 96–99 ("Defendant has a strong financial incentive …
Defendant and its partners [ ] participate in data-driven ad targeting, increase the
value of its advertising inventory, and track users across sessions and websites, all of
which provide economic benefit[.]").  This allegation alone suffices to support a
finding that Plaintiff adequately pleaded standing.  *See, e.g.*, *Greenley v. Kochava,
Inc.*, 684 F. Supp. 3d 1024, 1038 (Article III standing alleged where "Plaintiff …
conferred a benefit on Defendant through the use and dissemination of Plaintiff's …
personal information … which Defendant used and disseminated for its own
monetary benefit.") (cleaned up).  These allegations are like *Greenley*, where the
defendant collected the data, "packaged" it, "and sold it to clients for advertising
purposes."  *Id*., at 1035; see also, e.g., FAC ¶¶ 96–99.  And Plaintiff alleges "the
tracking software captured more than just [Plaintiff's] IP address … and that this
information was sent to third parties, not just Defendant."  *Rodriguez v.
Autotrader.com, Inc*., 762 F. Supp. 3d 921, 930 (C.D. Cal. 2025).  "Courts in this
District have regularly held that even if plaintiffs have suffered no economic loss
from the disclosure of their plausibly private information, they are allowed to

proceed through the pleadings stage with a claim for unjust enrichment to recover the gains that a defendant realized from its allegedly improper conduct." *Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *15. Thus, even under *Popa's* more stringent analysis, Plaintiff pleads multiple independent bases for concrete injury.

## B.    The Court has Personal Jurisdiction over Defendant

In the absence of a federal statute governing personal jurisdiction, courts must turn to the law of the state in which the court sits; in this case, California. *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750 (9th Cir. 2025). The California statute provides for personal jurisdiction so long as it is within the limits of the Due Process clause. *Id.* For a court to exercise personal jurisdiction over a nonresident defendant "the defendant must have 'certain minimum contacts' with California 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.*

### 1.    <u>Tesla Expressly Aimed Its Tracking Conduct at California Users</u>

Plaintiff alleges that Tesla intentionally designed and deployed its tracking architecture, knowing it would execute on the devices of California consumers, including Plaintiff, during visits to its website. FAC ¶¶ 16–19, 21–23. The FAC alleges the Website includes California-specific legal and privacy disclosures, demonstrating Tesla's awareness that California residents use the site and that the site is engineered to interact with them. *Id.* ¶¶ 17–19. Plaintiff further alleges Tesla's Website is its "primary commercial channel" for marketing, selling, and arranging delivery of vehicles to California residents, including Plaintiff. *Id.* ¶¶ 21–23. These allegations establish express aiming because Tesla knowingly deployed the tracking code in a manner intended to interact with, monitor, and monetize visits from California users.

### 2. The Illegal Interception Occurred on Plaintiff's Device in California

The FAC alleges that the interception occurs in California the moment Plaintiff loads Tesla's website. Plaintiff alleges that the trackers execute client-side code on his device in California before any data leaves the state. FAC ¶¶ 16–17, 39–44. The interception occurs at the point of origin—on a California device, during a California session, involving a California resident. Under well-established effects-test authority, the location of the interception itself is sufficient to establish purposeful direction. *Calder v. Jones*, 465 U.S. 783 (1984); *Walden v. Fiore*, 571 U.S. 277 (2014).

### 3. The FAC Pleads Tesla Uses the Data for Marketing, Profiling, and Monetization

Tesla argues the FAC does not plead Tesla "uses" the intercepted data. But Plaintiff alleges Tesla uses the data for targeted advertising, retargeting, profiling, and behavioral segmentation. FAC ¶¶ 9–12, 92–95. Further, Tesla selected, contracted with, and deployed the third-party trackers for the purpose of obtaining and exploiting the resulting user dossiers. FAC ¶¶ 74, 80–82, 92–95. These allegations distinguish this case sharply from *Briskin*, where Shopify did not deploy or use the data-collection tools and had no knowledge of where users were located. Here, Tesla is the architect and beneficiary of the interception.

### 4. Tesla's Conduct Creates a California-Specific Harm

Plaintiff alleges the harm occurred while he was physically present in California. FAC ¶16. The resulting loss of privacy and control occurred **in-forum**, satisfying the requirement that the effects be felt where the plaintiff resides. For these reasons, even under *Briskin*, all three prongs of the effects test are satisfied.

Specific jurisdiction is analyzed in a three-part test, that: (1) the defendant purposefully availed themselves of the laws and benefits of the forum state, (2) the

claim arises out of or relates to the defendant's forum related activities, and (3) the exercise of jurisdiction comports with fair play and substantial justice. *Id.*, at 750–751. "The Plaintiff has the burden of proving the first two prongs." *Moody v. Textron Inc.*, 2025 WL 2025597, at *3 (C.D. Cal. July 2, 2025). If the plaintiff meets their burden, the burden then shifts to the defendant to "make a compelling case" that the exercise of jurisdiction would not be reasonable. *Id.*

## 5.    Defendant Purposefully Availed Itself of California's Laws and Benefits

The "purposeful direction test requires that the defendant (1) commit an intentional act, that is (2) expressly aimed at the forum state, and (3) which causes harm that the defendant knows will be suffered in the forum state." *Briskin*, 135 F.4th at 751.

*Briskin* involved an invasion of privacy claim under CIPA by a company which installed trackers onto the website of another company. *Briskin*, 135 F.4th at 746. The court found personal jurisdiction because the defendant's internet trackers constituted purposeful availment of the jurisdiction of California. *Id.*, at 756. The Defendant relies heavily on the *Briskin* decision and claims the case requires "something more" than the foreseeable effect of a passive or interactive website. However, Defendant's application of "something more" to Plaintiff's allegations ignores reality.

At its core, Tesla is an automotive company known for selling electric vehicles. FAC ¶ 21. Defendant sells its vehicles internationally and domestically, including to consumers in California. *See* FAC ¶¶ 17–18 (Discussing Defendant's inclusion of California privacy disclosures as evidence that "Tesla has expressly aimed its website towards California consumers."). Defendant does not host a passive website "that someone physically located in California" could randomly stumble upon. MTD at 13. Instead, as explained in the FAC, Defendant's Website is central to its sales operation, including to California consumers. Defendant

"enables individuals and businesses to explore, customize, and order vehicles, manage accounts, schedule service appointment, and access support services through [the Website]." *Id*. The Website "is directly responsible for facilitating vehicle configuration, order processing, payment management, and communications with customers." *Id*. ¶ 22. "The Website serves as Tesla's primary digital touchpoint for customers. It allows users to research vehicles and energy products, reserve orders, schedule services, and access account management." *Id*. ¶ 23.

Despite "regularly engaging with individuals in California through its website", *id*. ¶ 25, "Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent," *id*. ¶ 2. Just like in *Briskin*, Tesla "knows about its California consumer base, conducts regular business in California, contacts California residents, interacts with them … installs its software onto their devices in California[.] … This 'conduct connects [Tesla] to [Californians] in a meaningful way.'" *Briskin*, 135 F.4th at 759; FAC 17–18, 21–23, 25; *see also*, *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957 (N.D. Cal 2025) (finding the use of specific trackers on the website, the specific identification of California law on the website, and knowingly collecting IP addresses was sufficient to establish personal jurisdiction). Defendant's decision to employ the Trackers on its Website harms California consumers.

In *Ford Motor Company v. Montana Eighth Judicial District,* the Supreme Court found Ford's substantial business operations in forum States supported specific personal jurisdiction under due process principles. *Ford Motor Company v. Montana Eighth Judicial District*, 592 U.S. 351, 355 (2021). Likewise, Tesla conducts substantial business in California and, as the FAC describes, its Website plays a pivotal role its operations and consumer engagement. FAC 17–18, 21–23, 25. Further, "corporations whose websites exploit a national market cannot defeat jurisdiction in states where those websites generate substantial profits from local

consumers.  *Briskin*, 135 F.4th at 757 (internal citation and quotations omitted).  Tesla cannot use its nationwide business to avoid liability in California.

Defendant attempts to distinguish itself and the third parties that operate the Trackers Defendant employs on its Website, suggesting that it does not have access to the information collected by the Trackers and did not know that Plaintiff was located in California.  However, this contradicts Plaintiff's well-pled allegation that Defendant "uses the data collected by the Trackers", FAC ¶ 9, raising a question of fact that is not properly before the court at this stage.

### 6.  Plaintiff's Claims Arise Out of Defendant's Contacts with California

Defendant does not argue that Plaintiff's claims do not arise out of the Defendant's contacts with California.  *See* MTD at 15–16.  As explained in § IV.B.1 *supra*, Defendant purposely availed itself of California's laws and benefits.

The instant case is analogous to *Briskin*.  Plaintiff's claims arise out of Defendant's decision to install and operate tracking software on the Website without providing California users with adequate notice or obtaining their informed consent.  *See* FAC ¶¶ 2, 25.  "Shopify deliberately reached out beyond its home state by knowingly installing tracking software on unsuspecting Californians' phones so that it could later sell the data it obtained, in a manner that was neither 'random, isolated [n]or fortuitous."  *Briskin*, 135 F.4th 759.  Like the defendant in *Briskin*, the claims against the Defendant in this case arise out of the Defendant's contacts with California.

### 7.  The Exercise of Jurisdiction Comports with Fair Play and Substantial Justice

Defendant bears the burden "to present a compelling case that the exercise of jurisdiction is not reasonable."  *Briskin*, 135 F.4th at 761 (internal quotation and citations omitted).  "It is the defendant's burden to establish that personal jurisdiction in this case would be unconstitutional."  *Leon v. URL Pharma, Inc.*, 692 F. Supp. 3d

973, 984 (C.D. Cal. 2023). Generally, "where a defendant 'manifestly has availed [itself] of the privilege of conducting business [in the forum state] ... it is presumptively not unreasonable to require [it] to submit to the burdens of litigation in that forum as well[.]'" *Leon*, 692 F. Supp. 3d at 984–85 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

Courts in this District employ a seven (7) factor balancing test when assessing the reasonableness of personal jurisdiction:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Briskin*, 135 F.4th at 761 (internal citation omitted).

Defendant did not address any of these factors; instead, it only contested purposeful availment. *See* MTD 10–16. The factors weigh in favor of or, at worst, are neutral towards finding the exercise of personal jurisdiction reasonable. Specifically, factors (1), (4), (5), and (6) weigh in favor of reasonableness. Defendant has availed itself of the laws and benefits of California by conducting its business in the State. California has a strong interest in adjudicating this dispute. *Burger King*, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."). Litigation in California, where the claims arose, is the most efficient way to address the claims raised by Plaintiff. Given Plaintiff's connection to California and the state's connection to the violative conduct, California is also a forum in which plaintiff can pursue convenient and effective relief.

There is no evidence to suggest that factors (2), (3), and (7) weigh against finding the exercise of personal jurisdiction reasonable.  The Defendant has not indicated it would be burdened by having to litigate in California.  There is no indication that litigating this matter in California will create a conflict with the sovereignty of Defendant's state.  Finally, the possibility of an alternative forum that would or could resolve the dispute is neutral at best.  Accordingly, the court should find that the seven (7) factors weigh heavily in favor of finding its exercise of personal jurisdiction over Defendant reasonable.

## C.    The Court Should Not Dismiss For Failure To State A Claim

Defendant argues that the "third-party 'tracking' software on the Website in the FAC does not constitute a 'pen register' and/or 'trap and trace device' as a matter of law."  MTD at 8.  Federal courts adjudicating these claims disagree.  CIPA has been interpreted to apply to new technologies where such application does not conflict with the statutory scheme.  CIPA prohibits installing or using "pen registers" without prior court approval.  *See* Cal. Penal Code § 638.51(a).  "Nothing in the statutory definition limits pen registers to those that operate the same way as a traditional phone pen register."  *Shah*, 754 F. Supp. 3d at 929.  The text of the statute is not only broad (*Greenley*, 684 F. Supp. 3d at 1050); it expressly contemplates technology beyond telephones, vis-à-vis defining "pen registers" as including devices or processes that capture "wire *or* electronic communications[s]."  Cal. Pen. Code § 638.50(b) (emphasis added); *see also Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 41 (S.D.N.Y. 2025) ("[T]he definition of pen register in CIPA encompasses a variety of 'electronic communications.'").

CIPA defines a "pen register" as a "device or process that records or decodes … information transmitted by an instrument or facility from which a wire *or* electronic communication is transmitted."  Cal Pen. Code, § 638.50, subd. (b) (emphasis added).  Thus: "[b]y the plain meaning of § 638.50(b), collection of the

recipient phone number or IP address is not a required element.  All that is required is that the Trackers record addressing information transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to [Defendant's] website, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue." *Shah*, 754 F. Supp. 3d at 929; *see also Garon v. Keleops USA, Inc.*, 2025 WL 2522374, at \*3–4 (N.D. Cal. Sept. 2, 2025) (rejecting argument that trackers were not "pen registers" because they did not "make any record of other outgoing routing, dialing, or signaling information").

### 1. The FAC Pleads the Digital Equivalents of Dialing, Routing, Addressing, and Signaling Information

Tesla argues the FAC does not plead Dialing, Routing, Addressing, and Signaling ("DRAS") information.  But the complaint explicitly alleges that Tesla's trackers collect and transmit:

- Outgoing HTTP requests containing Plaintiff's public IP, URL paths, user-agent, and routing metadata.  FAC ¶¶ 39–44, 54–55, 73–74.
- Incoming server responses that necessarily include source and destination IP headers.  *Id*. ¶¶ 39–44.
- Session identifiers, fingerprinting attributes, and cross-device identifiers used to correlate communications to a particular user.  *Id*. ¶¶ 73–82.

The FAC details how each of the three specific trackers—Google Trackers (*Id*. ¶¶ 144–163), Twitter Tracker (*Id*. ¶¶ 164–180), and StackAdapt Tracker (*Id*. ¶¶ 181–196)—captures and transmits precisely this type of DRAS information.

For Google, Plaintiff alleges the trackers automatically collect page URLs, referrer headers, browser identifiers, IP addresses, screen resolution, operating system, and language settings, transmitting them to Google's servers through requests to googletagmanager.com, analytics.google.com, and googleads.g.doubleclick.net upon page load. *Id*. ¶¶ 145–159.  For Twitter, Plaintiff alleges the Twitter Tracker executes automatically and transmits session-specific

identifiers, request headers, and referrer information tied to the user's browsing activity, establishing network connections that transmit browser, device, and session metadata in real time. *Id*. ¶¶ 165–176.  For StackAdapt, Plaintiff alleges the tracker initiates automatic network connections to StackAdapt's servers upon page load, exchanging addressing and session-identifying data such as IP address, referrer URL, and browser user-agent string, and engaging in identity synchronization through external advertising domains. *Id*. ¶¶ 181–183.  These allegations are precisely what § 638.50(b)–(c) defines as "dialing," "routing," "addressing," and "signaling" information.  Thus, Plaintiff pleads the statutory elements with specificity.

### 2.    The Interception Is Not "Voluntary" Disclosure

Tesla argues Plaintiff "voluntarily sent" his IP address.  But the FAC pleads the opposite: that Tesla caused hidden JavaScript, pixel trackers, and SDKs to **trigger non-user-initiated communications** with Google, X/Twitter, and StackAdapt.  FAC ¶¶ 39–44, 76–82.  These transmissions occur **before any user input**, immediately upon page load, and without Plaintiff's knowledge or consent. *Id*. ¶¶ 2–3, 12, 44–45.

This is the essence of a pen register/trap-and-trace device: a program or instrument that covertly captures addressing and routing information without the user's volitional act.  CIPA's statutory text applies directly to this architecture.

### 3.    Plaintiff Pleads Non-Content DRAS Information

Tesla's "content" argument claims the FAC must allege content or lose CIPA protection.  But the FAC pleads non-content DRAS information, including routing data, IP address, device identifiers, browser fingerprinting, and URLs. *Id*.  ¶¶ 39–44, 54–55, 74–82.  These are exactly the types of non-content signals CIPA protects under §§ 638.50–638.51.

#### 4.    <u>The Data Is User-Specific Because Identity
Resolution and Reidentification Are Built-In</u>

Tesla argues the data is anonymous, but the FAC alleges the opposite: that Tesla's chosen partners specialize in reidentifying users through the combination of IP, cookies, fingerprinting, and behavioral data.  FAC ¶¶ 74–82, 99–108.

More specifically, Plaintiff alleges that each tracker operator functions as, or partners with, data brokers engaged in identity resolution and person-level targeting. The FAC establishes that Google's DoubleClick (*Id*. ¶¶ 143–163) operates as a demand-side platform performing real-time behavioral identification and audience segmentation.  For Twitter, Plaintiff alleges the tracker's function is to identify users and enable cross-visit recognition and data correlation through persistent cookie storage.  *Id*. ¶¶ 165–176.  For StackAdapt, Plaintiff specifically alleges that it is a registered California data broker (*Id*. ¶ 101) whose core business model is identity resolution and person-level targeting, engaging in identity synchronization through external advertising domains and functioning as a behavioral tracking process that captures user-level network metadata for retargeting purposes (*Id*. ¶¶ 181–189).

The FAC further alleges that these trackers collectively participate in cookie syncing and identity reconciliation across multiple data brokers, combining IP addresses, Device Metadata, User Information, and unique user IDs with comprehensive profiles to de-anonymize users for real-time bidding and targeted advertising. *Id*. ¶¶ 128–137, 140–143. Thus, the DRAS data collected is person-specific, not anonymous technical information.

The Trackers here are "pen registers" because they are "processes."  Courts have held that processes – like the Trackers at issue – encompass "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'"  *Greenley*, 684 F. Supp. 3d at 1050.  These activities are precisely what Plaintiff alleges.  The Trackers that Defendant embeds in its website are operated and used by the Third Parties to collect consumer data, de-anonymize and

identify consumers by combining the collected information into comprehensive profiles, and ultimately sell those profiles to numerous advertisers through the real-time bidding process. FAC ¶¶ 99, 120, 128, 137; *see also Mirmalek*, 2024 WL 5102709 at *4 ("Plaintiff alleges that the instruments or facilities are users' computers or smartphones … [and] that users' devices transmit electronic communications in the form of Hypertext Transfer Protocol … or GET requests to load Defendant's website.") (cleaned up).

Plaintiff alleges that the Trackers Defendant embedded on its website are pen registers as defined under Cal. Penal Code § 638.50. Specifically, Defendant installs the Trackers on Plaintiff's internet browser. FAC ¶¶ 139, 141–158, 168–175. The Trackers are pen registers under CIPA because they collect and store users' information, including routing information such as IP addresses and cookies which uniquely identify each user. FAC ¶¶ 154, 169, 171, 179, 183. The Trackers collect consumer's IP addresses and other routing, signaling, or addressing information along with cookies, unique user ID, and/or Device Metadata which allow for the de-anonymization and identification of users. FAC. ¶¶ 10, 11, 57, 120, 128, 137. Of note, the definition of pen register found in Cal. Penal Code § 638.50 does not limit "pen registers to those that operate the same way as a traditional phone pen register." *Shah*, 754 F. Supp. 3d at 929. On the contrary, the California Legislature chose "expansive language" for the definition of a "pen register" that "the Court cannot ignore," language that is "specific as to the type of data [collected]," but "vague and inclusive as to the form of the collection tool" (*i.e.* "device or process"). *Greenley*, 684 F. Supp. 3d at 1050.

Thus, federal courts have consistently held that online trackers or tracking software such as the Trackers at issue here are "pen registers." *See, e.g.*, *Shah*, 754 F. Supp. 3d at 929 (agreeing with "[p]laintiffs' theory [] that the third-party Trackers operate as pen registers under the meaning of the statute because they are processes that record users' IP addressing information"); *Mirmalek*, 2024 WL 5102709, at *3

("[U]nder the inclusive language of CIPA's definition of a pen register, Plaintiff sufficiently alleges that the Trackers are a 'device or process…'"); *Moody*, 742 F. Supp. 3d at 1076 ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley*, 684 F. Supp. 3d at 1050 (finding software constituted a "pen register"); *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880 (S.D. Cal. 2025) (same); *Rodriguez*, 762 F. Supp. 3d at 929 (same); *Lesh*, 767 F. Supp. 3d at 40 (same).

To that end, there are several reasons to find the authorities cited by Plaintiff here are more persuasive, and that the state court case is distinguishable regardless. In *Aviles v. Liveramp, Inc.*, 2025 WL 487196, at *3 (Cal. Super. Ct. Jan. 28, 2025), the defendant did "not argue that software cannot be a pen register or trap and trace device."  Instead, the *Aviles* court focused on whether IP addresses are "routing, addressing, or signaling information."  *Aviles*, 2025 WL 487196, at *2.  IP addresses are "routing, addressing, or signaling information" for the reasons explained above. But the *Aviles* court still agreed with Plaintiff that "the statutory definition of a pen register now includes electronic communications in mediums *other than simply telephone communications*."  *Aviles*, 2025 WL 487196, at *2 (emphasis added).

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion.  If the Court grants the Motion in any respect, Plaintiff respectfully requests leave to amend.  *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).


Dated:  November 26, 2025          **BURSOR & FISHER, P.A.**

By:   /s/ *Daniel S. Guerra*
                     Daniel S. Guerra

L. Timothy Fisher (State Bar No. 191626)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Daniel S. Guerra (State Bar No. 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
         dguerra@bursor.com

Reuben D. Nathan, Esq. (State Bar No. 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (State Bar No. 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff: PETER DAWIDZIK*

**LOCAL RULE 11-6.2 CERTIFICATION OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff Peter Dawidzik, certifies that this brief contains 6,826 words, which complies with the word limit of L.R. 11-6.1.

Dated: November 26, 2025            /s/ *Daniel S. Guerra*
                                                Daniel S. Guerra